(69 South. 804)

No. 20042.

FULLER v. CHICAGO, R. I. & P. RY. CO.

SMITH et al. v. SAME.

(June 11, 1915. Rehearing Denied Oct. 18, 1915.)

*(Syllabus by the Court.)*

1. RAILROADS ☞487—DAMAGES FROM FIRE—JUDGMENT—EVIDENCE.

Where, in a suit against a railroad company for damages resulting from the burning of a store near its track, it is shown that the fire originated upon the shingle roof of the building, within 10 or 15 minutes after the emission of a profusion of sparks and cinders from a locomotive which was engaged in making a "flying" or "drop" switch, within a distance of, say, 60 or 70 feet, and it is admitted that the fire was started by sparks or cinders from the locomotive in question, but is argued that they might have been emitted previously when the locomotive was otherwise engaged, at the same point, the court will take, as the basis of its judgment, the adequate cause established by the evidence and admission, rather than the hypothetical cause not so established.

[Ed. Note.—For other cases, see Railroads, Cent. Dig. § 1758; Dec. Dig. ☞487.]

2. RAILROADS ☞480, 482 — DAMAGES FROM FIRE—BURDEN OF PROOF—SUFFICIENCY OF EVIDENCE.

Where it is shown and admitted that live cinders emitted from a locomotive set fire to a store, which, with its contents, was burned, the burden is thrown upon the railroad company, sued for loss, to show that the locomotive was constructed and equipped to prevent the emission of sparks and cinders, so far as that is reasonably possible, and that it was handled prudently and with due regard to surrounding conditions; and that burden is not successfully carried when it appears that, though the spark arrester in use permitted the passage of live cinders in great profusion and of large size when the locomotive was making a "flying switch," the "flying switch" was, nevertheless, made upon a dry day, in a dry season, and when a stiff wind was blowing the cinders upon the old and dry shingles constituting the roof of a frame building only 60 or 70 feet distant.

[Ed. Note.—For other cases, see Railroads, Cent. Dig. §§ 1709–1716, 1730–1736; Dec. Dig. ☞480, 482.]

Appeal from Fourth Judicial District Court, Parish of Lincoln; J. B. Holstead, Judge.

Two actions consolidated, one by Charles C. Fuller, the other by Mrs. Emma Smith and others, both against the Chicago, Rock Island & Pacific Railway Company. From judgments for plaintiffs, defendant appeals. Affirmed.

Thos. S. Buzbee, of Little Rock, Ark., and Barksdale & Barksdale, of Ruston, for appellant. McLaurin, Armistead & Brien, of Vicksburg, Miss., and Hardy & Atkinson, of Shreveport, for appellees.

Statement of the Case.

MONROE, C. J. Defendant prosecutes this appeal from a judgment awarding plaintiffs damages for the destruction by fire of two buildings, with part of their contents, owned by them, respectively, in the town of Dubach; the fire having been ignited by sparks or cinders emitted from one of defendant's locomotives as a result of the alleged defective equipment and negligent handling of the locomotive. Plaintiffs have answered the appeal, praying for an increase in the amounts awarded.

The suit was brought, in part, for the benefit of certain named insurance companies by which part of the loss was paid, and which are subrogated to plaintiffs' rights with respect thereto, and defendant filed exceptions of nonjoinder, on the ground that the companies should have been joined as plaintiffs; but the exceptions were overruled by the trial judge, and are not urged in this court.

The following are undisputed facts, of which the blueprint hereto attached will aid in the understanding, to wit:

Defendant's main track is laid northeast and southwest (though, for convenience, we shall refer to the moving cars as north-bound and south-bound) through Dubach, crossing Main street (which runs north and south) diagonally, and there is a switch track (which we shall call the "cotton track") on the north side of it, and a siding (which we shall call the "house track") on the south side, with the depot between it and the main track.

DUBACH, LA.

"A" – SWITCH, COTTON WAREHOUSE TRACK.
"B" – SOUTH SWITCH OF SIDING.
"C" – SWITCH OF MILL TRACK.
"D" – NORTH SWITCH OF SIDING.

There is also a switch, or branch, called the "mill track," which leaves the main track at a point several hundred feet to the southward of the depot. Plaintiffs owned two frame shingled houses, built with a partition wall between them and gabled roofs, one of the slopes of each of which met a slope of the other, forming a valley. The gable ends of the buildings fronted on Main street, and the southeast corner of Fuller's building, which was the nearer of the two, was about 63 feet from the "cotton track." The fire occurred on the morning of November 4, 1912, at about 11 o'clock, the day being clear, with a stiff wind blowing from the direction of the track towards the buildings, and the season had been unusually dry.

The north-bound freight train stopped at the depot at 10:42 a. m. It then backed on the main track to a point below Fuller's

store, where three or four cars, with the locomotive, were uncoupled, and the locomotive pulled the cars northward until it passed the cotton track switch, when it backed them, through that switch, on the cotton track, and there picked up a "dead" locomotive and pulled out again on the main track, and backed down on that track until the dead locomotive reached the cars which had been left there, and thus, with the cars to which it had been attached in front of it, found a place about the middle of the train, as thus made up. The live locomotive then uncoupled from the train and headed in on the house track, where it picked up a car, and, backing out, with the car attached, on the main track, pushed the car ahead on that track until it passed the cotton track switch, when it again backed to the southward, with a view, by means of a "flying switch," of itself running down the main track, and, the switch being then thrown, of allowing the car to follow, with acquired momentum, and run through the switch and on the cotton track. The movement thus described made it necessary for the locomotive, while pulling the car, to slow down at some distance before reaching the switch, in order that the car might be uncoupled, and then suddenly to accelerate its own speed in order to run away from the car, pass the switch and allow it to be thrown, and to run south, on the main track, until it reached a point where the distance between the two tracks became great enough to allow the car following on the cotton track to pass it, and that sudden acceleration of speed, together with the fact that the movement was made up a heavy grade, involved a violent exhaust of steam and a profuse emission of sparks and live cinders, some of which, it is believed, falling upon the nearer slope of the roof of Fuller's building, ignited it, with the result that within 10 or 15 minutes thereafter a space, described by a practicing physician (who, in

approaching the building, first saw it) as about the size of a man's hat, was ablaze, and the further result that both buildings, with the greater part of their contents, were destroyed by fire within the 25 minutes that followed.

The trial judge in his written opinion says:

"The fire was caused by a spark or sparks from an engine of the defendant company, while making a flying or drop switch near the property destroyed. The engine was at the time in ordinarily good condition. Flying or drop switching creates more cinders, with greater force, than the ordinary or slower mode of switching. The switching on this occasion, and the quantity and size of cinders thrown out, was about as usual at that place, with the exception of the force and direction of the wind. At the time of the fire, or on the day of the fire, there was a constant stiff breeze from the switching point to the houses that were burned. The wind was not of such a character as to have been particularly remembered, except in connection with the burning building, but was of sufficient force to create greater danger from the emission of sparks. It was a lack of care for that kind of switching to be made in a dry season so near the houses, with the wind blowing directly from the switching point to the houses. 33 Cyc. 1336. There are some suspicious circumstances indicating that the master mechanic's front end was not in order; but, fairly weighed with all the evidence, they give way to a preponderance that the front end, with the spark arrester, was all right, and the conclusion is forced on the mind that the fire was caused by the imprudence of that kind of switching, so near shingle roofs, getting old, with, necessarily, some decayed parts, easily combustible in a dry time," etc.

### Opinion.

[1, 2] Conceding that defendant, in the operation of its locomotive, set fire to plaintiffs' property, defendant's learned counsel argue, in effect, that their client has thereby incurred no liability for the resulting loss, because, in the first place, it is as likely that the sparks or live cinders which started the fire were emitted when the locomotive was backing the train on the main track as when it was making the flying switch; in the second place, that whether they were emitted upon the one occasion or the other, the two movements were equally necessary in the ordinary conduct of defendant's business as

a common carrier, were made with all the care that could reasonably be required of defendant, and with a locomotive equipped with an approved spark arrester, for the failure of which to discharge its functions defendant is not responsible; and, in the third place, that plaintiffs were at fault in having their buildings covered with inflammable roofs.

That defendant has been constantly and for some years making flying switches at the point in question, that its locomotives have constantly emitted a profusion of sparks and of live cinders as large as buckshot or the end of a man's finger, that there was such a movement and such an emission of sparks and cinders at about 11 o'clock on the morning of November 12, 1912, that the shingle roof of plaintiffs' store, about 63 feet distant, was discovered, within 10 or 15 minutes thereafter, to be on fire on the outside, as from a spark or cinder which had alighted there, the extent of the burning space at the time of the discovery being about the size of a man's hat, and that the buildings were burned, with the greater part of their contents, within the following 25 minutes, are facts which are established by direct and practically uncontradicted and unchallenged testimony. It is argued that it is as likely, or more likely, that the sparks or cinders (and we shall hereafter call them cinders, since those which have been brought up as exhibits are larger than the buckshot which have been brought with them, and would be unjustly disparaged by the application to them of the term "sparks") were emitted when the engine was backing the entire train up the grade, than when it made the flying switch; but, while it is not unlikely that cinders were emitted at that time, there is no evidence that, as a fact, they were so emitted, whereas the evidence that they were emitted in great abundance when the flying switch was made is direct and positive.

With that fact established, and the admission by defendant that the fire was started by cinders emitted by its locomotive, we conclude that we have an adequate cause for the fire in the cinders emitted in the flying switch movement, and find no reason for seeking a cause in the hypothesis that the fire might have been ignited by cinders emitted during a previous and somewhat different movement of the locomotive; in fact, we are inclined to the opinion that, while the sudden acceleration of speed necessary to enable the locomotive to run ahead of the car from which it had been uncoupled and get out of its way inevitably required a heavy exhaust of steam and a consequent blowing out of cinders, we are not shown by the evidence that any such exhaust was required in the regular movement of backing the train to the point to which it was backed before the flying switch was made.

The learned counsel for defendant also argue, in effect, that a "flying switch" may be as necessary as any other movement in the handling of railroad cars and trains, and that the bad name that it enjoys (or unjustly endures) with its brother, the "kicked switch," by reason of the danger to which they subject the citizen or switchman, should not be remembered against it in a case such as this, since (counsel allege) the starting of a fire by means of a cinder bears no relation to the killing or maiming of the citizen or switchman. But the necessity to which the counsel refer was in this case (and the same is probably true in most cases) entirely economic; in other words, one of defendant's witnesses said that it would have taken ten times as long for the locomotive here in question (No. 1808) to have taken the car out of the upper end of the house track, and then to have backed it down the main track and into the cotton track, than to "drop switch" it into the cotton track, and it is deduced therefrom that a railroad

company cannot efficiently discharge its functions unless it can make "drop," "flying," and "kicked" switches. Our answer to that is: First, that the witness, in our opinion, has overstated the difference in time required for the respective movements; second, that if the conditions at Dubach are such that flying switches are necessary, those conditions might be changed so that they would no longer be necessary; third, that the necessity in question is propounded, as it appears to us, rather in the interest of the railroad company than the public, and means that the company should be permitted to save time and money, though men may be killed and their houses burned, and, from that point of view, is not a necessity that the courts can recognize.

It is further argued, and a number of witnesses called by defendant have testified, that the spark arrester with which locomotive No. 1808 was provided was of an approved and standard pattern.

Defendant's general boiler inspector says of it:

"This netting has been adopted by a good many other railroads throughout the United States, while some are using a little finer mesh netting. That is due to the fact that they are using a different grade of coal. Different grades of coal require different meshes of netting."

We are not informed as to the grade of coal used by defendant or why it uses it. We are informed by the foreman of the boiler makers of the Vicksburg, Shreveport & Pacific Railway Company that the netting used by that company has a smaller mesh than that used by defendant. We are not informed why the defendant uses the netting with the larger mesh, and we understand that the larger the mesh the larger the live cinders that go through.

The testimony of defendant's inspector leaves the date and result of his inspection of the spark arrester on locomotive No. 1808 rather uncertain, and it is not made clear that he inspected in a manner to find out whether cinders may not have gone into the smokestack otherwise than through the spark arrester, though it is shown that there may be apertures through which they may pass, if the spark arrester is not properly adjusted, or the fittings through the diaphram are not made close. There can be no doubt that, it having been shown conclusively and admitted that the fire was started by a cinder or cinders from defendant's locomotive, the burden rests upon defendant to show that it did not happen by reason of its fault or negligence, but in spite of the fact that, the whole situation considered, it took all reasonably possible precautions in the equipment and handling of the locomotive to prevent it. This burden has not been successfully carried in either respect, though the failure is more conspicuous in the matter of the handling than of the equipment. The most that is asserted in that regard, is that the locomotive was handled in the ordinary way; whereas, in view of the fact that the season and day were dry and the wind blowing the hot cinders directly upon the shingles with which plaintiffs' houses were covered, unusual precaution was required. The ordinary way, however, appears to us to have been a bad way, since it involved the use of a spark arrester that did not arrest sparks or cinders of considerable size with the flying switch movement, on very frequent occasions, when a more efficient spark arrester was urgently needed, which suggests that defendant should either have provided itself with another spark arrester or have discontinued the flying switch.

Plaintiffs were inadequately insured, and, though the insurance companies settled with them promptly, they did so upon bases that were reached after making the deductions usual in such cases, and these suits were brought upon those same bases; but, our learned brother of the district court was, nevertheless, of opinion that the amounts

claimed were in excess of those to which plaintiffs were entitled by "at least 10 per cent.," and gave judgment accordingly. We have carefully considered the testimony upon that branch of the case, and do not find that it calls for any amendment of the judgment so rendered.

It is therefore ordered, adjudged, and decreed that the judgments appealed from be affirmed, at the cost of the appellant.